# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| CARMEN L. RIVERA,<br>        Plaintiff,<br><br>        v.<br><br>MEGAN J. BRENNAN, POSTMASTER<br>GENERAL,<br>        Defendant. | No. 3:16-cv-330 (VAB) |

## RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

Carmen L. Rivera ("Plaintiff") filed this lawsuit against the Postmaster General of the

United States Postal Service Megan J. Brennan ("Defendant") under Title VII of the Civil Rights

Act of 1964 ("Title VII"), 42 U.S.C. § 2000(e), *et seq.* Amend. Compl. ¶¶ 1–4, ECF No. 20.[1] Ms.

Rivera alleges that, on account of her gender, she has "suffered a hostile work environment,

disparate treatment, and retaliation as a result of her opposing and reporting sexual harassment

and discrimination" in the workplace. *Id.* ¶ 34.

Defendant now moves for summary judgment, and argues that Ms. Rivera's claims of

sexual harassment, hostile work environment, and retaliation must be dismissed as a matter of

law. ECF No. 27.

For the following reasons, the motion is **GRANTED**.

---

[1] Although the parties do not raise the issue, the Court notes that the Postmaster General is the proper party in an action under Title VII. *See* 42 U.S.C. § 2000e-16(c) (providing that an employee may file a civil action under 28 U.S.C § 2000e-5, "in which civil action the department, agency, or unit, as appropriate, shall be defendant").

# I.  FACTUAL AND PROCEDURAL BACKGROUND[2]

## A.  FACTUAL ALLEGATIONS

Ms. Rivera, a Supervisor of Customer Services at the United States Post Office in Bridgeport, Connecticut, since August 2014, is currently assigned to the Post Office in Wallingford, Connecticut. Def.'s SMF ¶ 1–2. At her request, she has gone from Bridgeport to the Post Office in Stratford (April 2015) and then North Haven (July–October 2015). *Id.* Since requesting to be transferred from North Haven, Ms. Rivera has been working at Wallingford location since November 2015. *Id.* Derek Hudson, a Manager of Customer Service for USPS, supervised Ms. Rivera at the Bridgeport Office. Def.'s SMF ¶ 3. Gary Thompson, the Postmaster for the Bridgeport Post Office, supervised Mr. Hudson. *Id.* ¶ 4.

### 1.  The January 24, 2015, Meeting

On January 24, 2015, Mr. Hudson sat at his desk in his office eating his lunch. *Id.* ¶ 5. While he ate, Mr. Thompson had been with him in his office. *Id.* When Mr. Thompson left the office, Ms. Rivera entered. *Id.* ¶ 7. She wanted to meet with Mr. Hudson regarding a postal carrier who reported to Ms. Rivera. *Id.* ¶ 8. While they were meeting, Mr. Hudson stood up from behind his desk to retrieve a bottle of water from a nearby refrigerator, and Ms. Rivera saw that Mr. Hudson's belt was "open." Rivera Dep. at 69:1–7, Def.'s SMF, Ex., ECF No.27-3. When he stood up his pants did not fall down, Def.'s SMF ¶ 11, but Ms. Rivera observed that "[h]is button was open because . . . the belt was pushing it like that." Rivera Dep. at 69:9–11. She could see some "ruffling[] of his shirt" and that "his zipper [was] slightly open." *Id.* at 69:11–13. She could

[2] The relevant factual allegations are taken from Defendants' Local Rule 56(a)(1) Statement (" Def.'s SMF"), ECF No. 121-2, and attached exhibits, ECF Nos. 27-3–27-4, 28, and Ms. Rivera's Local Rule 56(a)(2) Statement ("Pl.'s SMF"), ECF No. 34-1, and the attached exhibit, ECF No. 34-2. *See* D. Conn. L. Civ. R. 56. They are undisputed, unless otherwise noted.

not see Mr. Hudson's underwear or anything beneath them. Def.'s SMF ¶ 12. After averting her eyes, Ms. Rivera claims that she heard "the jingling of his belt," and assumed he was "correcting himself." Rivera Dep. at 69:21–70:4.

Ms. Rivera testified that Mr. Hudson apologized to her and stated "I just finished eating and, you know, the belt was bothering me." Rivera Dep. at 69:19–21. Ms. Rivera compared Mr. Hudson's "excuse me" to "a man coming out of the bathroom with his zipper down. You know, [an] honest mistake." *Id.* 84:23–85:1. The two continued to discuss work matters. *Id.* at 70:6–7.

After about ten minutes, Ms. Rivera saw: "[Mr. Hudson] lift[ ] his leg up, his buttocks or whatever, his butt, and just pass[ ] gas, loud, and obnoxious." *Id.* at 70:7–10. "[S]hocked, disgusted," and "embarrassed," Ms. Rivera said to him, "Oh, my god. I don't believe you just did that." *Id.* at 70:11–13. Mr. Hudson responded, "Ah, my grandmother said, 'Better out than in.'" *Id.* 70:17–18. Again, the two resumed discussing work matters. *Id.* 70:24–25.

Shortly thereafter, another supervisor of customer service, Marcia Perkins, joined the meeting with Ms. Rivera and Mr. Hudson. Def.'s SMF ¶ 16. Mr. Hudson again stood up, revealing that his belt and pants remained "open." Rivera Dep. at 74:20. Speaking to Ms. Perkins, Mr. Hudson said "it's not what you think," laughed, and "fix[ed] himself up." *Id.* at 74:25–75:2. Although Ms. Perkins and Mr. Hudson continued talking, Ms. Rivera excused herself and left the room. *Id.* at 75:5–8. Ms. Rivera was "angry," "embarrassed," *Id.* at 75:25–75:1, and "shocked," *id.* at 239:20. Ms. Rivera thought to herself: "What's [Ms. Perkins] going to think?" *Id.* at 76:2–3; *accord* 88:13 ("What is she going to think was going on . . . ?"). Ms. Rivera "never" spoke to Ms. Perkins about the incident. *Id.* at 88:19–20. Ms. Rivera did discuss the incident with her boyfriend *Id.* at 94:16–95:3.

Although Ms. Rivera acknowledged feeling embarrassed about the incident, she also acknowledged that, while alone with Mr. Hudson that day, he made no sexual advances or physical contact with Ms. Rivera. *Id.* at 87:18–88:2. Although Ms. Rivera testified that it was "[v]ery possible" that she described the incident as "sexual" when recounting the incident to her boyfriend, she further testified that "[she] didn't know how to describe what [she] went through." *Id.* at 95:17–20.

### 2.  The January 29, 2015, Meeting

On January 29, 2015, Ms. Rivera met with Mr. Hudson to discuss the January 24th incident. *Id.* at 101:3–102:12. She informed him that she "didn't appreciate" what had happened, and that he had acted "very unprofessional." *Id.* at 103:3–6. Mr. Hudson asked a "barrage" of questions in what felt to Ms. Rivera like an "interrogat[ion]." *Id.* at 103:20–24. Ms. Rivera declined Mr. Hudson's requests to follow up with the Human Resources Department ("HR"). Def.'s SMF ¶ 26.

### 3.  The February 20, 2015, Meeting

On February 20, 2015, Mr. Hudson convened a meeting with Mr. Rivera, her National Association of Postal Supervisors ("NAPS") Representative Jeanette Sherrod, and himself. Def.'s SMF ¶ 28. NAPS representatives, according to Ms. Rivera, are "called when there's a problem with management and a supervisor." Rivera Dep. at 131:23–25.

Mr. Hudson called the meeting to discuss Ms. Rivera's overall work performance, including her failure to provide a daily Actual to Projections Report ("APR"), *id.*, which sets out the daily projected hours of work for each employee vis-à-vis the daily hours actually worked. Hudson Dep. at 49:14–50:2. Although she had been trained on generating APRs, Def.'s SMF ¶ 36, and she acknowledged that the report had been assigned to other managers, Rivera Dep. at

137:1–25, Ms. Rivera explained that she had "got a lot of stuff . . . to do," and does not have the appropriate program to generate the report. *Id.* at 134:7–9. According to Ms. Rivera, he replied: "I don't care. You have to make time. You have to make time to get this report to me. I want it here every day." *Id.* at 134:12–14. According to Ms. Rivera, Mr. Hudson threatened to write her up if she did not get him the report. *Id.* at 136:8–10. Mr. Hudson, for his part, denies that he ever threatened to or actually disciplined Ms. Rivera. Hudson Dep. at 47:15–48:13. It was also her understanding that this meeting was a pre-disciplinary interview ("PDI"). Rivera Dep. at 149:1–2. After the meeting, Ms. Rivera provided the report to Mr. Hudson on a daily basis. Def.'s SMF ¶ 33.

Ms. Rivera testified that Mr. Hudson had been a strict manager, as a general matter, who was "big on PDIs," "big on discipline," and "big on grievances." *Id.* ¶ 37. But she believed that his threat to discipline her was "coming because [she] confronted him and he was not happy about that." Rivera Dep. at 149:14–16. She felt that Mr. Hudson wanted to discipline her for "trivial stuff." *Id.* at 157:15.

### 4. The February 23, 2015, Meeting

On February 23, 2015, Ms. Rivera first reported the January 24th incident to Mr. Thompson and Ms. Sherrod. Def.'s SMF ¶ 38. By that afternoon, a meeting was convened among Mr. Hudson, Mr. Thompson, Ms. Sherrod, and Ms. Rivera. *Id.* ¶ 40. At the meeting, as Ms. Rivera described it, Mr. Hudson "blew up" and began screaming and yelling. Rivera Dep. at 154:22–24. Ms. Rivera explained to him that she did not feel "comfortable" and that he "crossed the line" in threatening to write her up. *Id.* at 154:25–155:4.

Ms. Rivera then informed Mr. Thompson that that she could no long work with Mr. Hudson. Pl.'s SMF ¶ B.12. She further explained to Mr. Thompson: "I don't think I can work

here anymore. Somebody's got to go. . . . I don't think that the professional relationship we had before will ever be the same." Rivera Dep. at 156:18–25.

As to whether Mr. Hudson discriminated against Ms. Rivera because she was a woman, she testified: "Well, yeah. I mean, because I was a woman, I felt extremely offended and—with everything he did with the pants and everything, that was horrible. *Id.* at 176:10–15. According to Ms. Rivera, Mr. Hudson did not treat female employees any differently than male employees, Def.'s SMF ¶ 43; she observed: "He was mean to everybody." Rivera Dep. at 176:16–21.

### 5. Human Resources

Approximately two days after February 23, 2015, meeting, Ms. Rivera wrote an email to the Human Resources Manager. Pl.'s SMF ¶ 13. In it, she reported Mr. Hudson's conduct during the January 24, 2016, meeting and thereafter. *Id.* Later that day, a representative from Human Resources followed up with Ms. Rivera regarding her email. Human Resources decided to conduct an internal investigation, known as a "Pub 552." *Id.* ¶ 14. Ms. Rivera informed the investigators from Human Resources that she felt that Mr. Hudson was retaliating against her because she had confronted him about how his behavior made her feel. *Id.* ¶ 15.

### 6. The Printer/Scanner

Mr. Hudson kept a second desk on the workroom floor of the post office, which was located at the opposite end of the building on a lower level than his office, near a printer, which also was near Ms. Rivera's desk. Def.'s SMF ¶ 41. Ms. Rivera claims that Mr. Hudson had "never" used the printer before the Human Resources investigation and had a working printer in his office. Rivera Dep. at 177:17–187:22. She described looking up: "[T]here he is. He's a tall man and I'm sitting down. At the printer. No blinking, no nothing. . . . It was the worst face. It had me running every time." *Id.* at 179:1–5.

Ms. Rivera claims she reported Mr. Hudson's use of the printer to Mr. Thompson. Pl.'s SMF ¶ B.19. She reported that she felt intimidated and that "[Mr. Hudson] was doing that on purpose . . . retaliating against me and making me run like a mouse." Rivera Dep. at 182:7–11. Mr. Thompson allegedly responded to Ms. Rivera that Mr. Hudson, as a manager, was able to use any printer he would like to use. Rivera Dep. at 182:5–6.

### 7.    The April 9, 2015, Daily Teleconference

On April 9, 2015, Mr. Hudson requested that all three supervisors, including Ms. Rivera, be prepared to participate in the daily teleconference with Phil Gioia, the Post Office Operations Manager. Def.'s SMF ¶ 42. Ms. Rivera testified that she had previously never been involved in preparing reports for the daily telephone conference. Rivera Dep. at 199:4–5. With another male colleague, Ms. Rivera joined the conference by telephone. *Id.* at 199:12–18. Mr. Hudson and Dave Carrasquillo, another employee, joined the call from another location. *Id.* at 199:12–200:13. On the call, Mr. Hudson allegedly stated that Ms. Rivera and another male employee, neither of whom had been on the call before, *id.* at 199:19–22, were going to answer the remainder of the questions on the call, *id.* at 200:16–18.

Because she did not have the information she needed, Ms. Rivera felt like a "buffoon[]." *Id.* at 200:23. Ms. Rivera testified that Mr. Carrasquillo later informed her that Mr. Hudson had instructed Mr. Carrasquillo to "be quiet" while on the call. *Id.* at 201:19. Apparently, it was Ms. Rivera's understanding that it was Carrasquillo who had the "papers" necessary to answer questions on the call. *Id.* at 201:12–21.

After the telephone conference, Mr. Thompson convened a meeting with Ms. Rivera and Mr. Hudson. Pl.'s SMF ¶ B.29. Ms. Rivera testified that, in this meeting, she informed Mr.

Thompson that she could not work in the office any longer. *Id.* at 206:13–24. Ms. Rivera claims that she was suffering from sleepless nights and anxiety over the situation. Pl.'s SMF ¶ B.30.

### 8. FMLA Leave

Ms. Rivera worked at the Bridgeport Post Office until April 9, 2015. Rivera Dep. at 209:1–4. On April 11, 2015, she began working at the Stratford Post Office, Pl.'s SMF ¶ B.31, where on April 20, 2015, she testified that she suffered a panic attack. *Id.* ¶ B.32. That same day, Ms. Rivera allegedly took leave under the Family and Medical Leave Act for the next two and three-quarters months because her doctor had informed her that it was not healthy to continue working. *Id.* ¶ B.33. Ms. Rivera has described herself as a "nervous person . . . more fidgety." Rivera Dep. at 214:2–4.

Since the January 24, 2015 incident, Ms. Rivera has been continuously employed by the U.S. Postal Service and has received all of her anticipated raises and promotions. Def.'s SMF ¶ 46.

### 9. EEOC Complaint

On June 23, 2015, Ms. Rivera filed a formal complaint with the National Equal Employment Opportunities Investigative Services Office. Def.'s SMF ¶ 47. The agency conducted an investigation and issued a final agency decision on December 9, 2015, closing Ms. Rivera's complaint with a finding of no discrimination. *Id.*

### B. PROCEDURAL BACKGROUND

On February 29, 2016, Ms. Rivera filed this lawsuit, ECF No. 1, and later amended her Complaint on July 20, 2016. ECF No. 20. The Amended Complaint alleges that Defendant, through her agents, servants, or employees, is liable under Title VII for sexual harassment, discrimination, and retaliatory conduct perpetrated against Ms. Rivera. Amend. Comp. ¶ 36. Ms.

Rivera seeks an award of compensatory damages, attorney's fees and costs, and prejudgment interest. *Id.* at 7.

The Court takes jurisdiction over this matter under 28 U.S.C. § 1331, and the parties agree that Ms. Rivera has exhausted her administrative remedies. Amend. Compl. ¶ 7; Answer ¶ 6.

Defendant now moves for summary judgment, arguing that Ms. Rivera cannot prevail under Title VII as a matter of law. Def.'s Br. at 1, ECF No. 27-1. On December 19, 2017, the Court heard oral presentations on the pending motion. ECF No. 37.

## II.    STANDARD OF REVIEW

The Court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Id.* "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Id.* at 250.

The Court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *Dufort v. City of New York*, 874 F.3d 338, 343 (2d Cir. 2017). The Court will not draw an inference of a genuine dispute of material fact

from conclusory allegations or denials. *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

## III.   DISCUSSION

### A.   FIFTH AND FOURTEENTH AMENDMENT CLAIMS

In the Amended Complaint, Ms. Rivera alleges that "Defendant, through her agents, servants, and/or employees, violated Plaintiff's Fifth and Fourteenth Amendment rights to be afforded equal protection and [the] benefit of the law, in violation of 42 U.S.C. [§] 2000(e), *et*[] *seq.*" Amend. Compl. ¶ 32. To the extent that Ms. Rivera sought to bring claims under the U.S. Constitution, having not raised them at the summary judgment stage, the Court deems these claims abandoned. *Rotbergs v. Guerrera*, No. 3:10-cv-1423 (MRK), 2012 WL 1204729, at *8 (D. Conn. Apr. 11, 2012) (citing *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir.1998)); *Rose v. Panolam Indus. Int'l Inc.*, 301 F. Supp. 2d 239, 247 (D. Conn. 2004) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." (citation omitted)). At oral argument, Ms. Rivera unequivocally confirmed that she no longer wished to pursue constitutional claims. The Court therefore grants summary judgment and dismisses Ms. Rivera's constitutional claims.

### B.   TITLE VII CLAIMS

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Ms. Rivera argues that Mr. Hudson, "subjected her to behavior and treatment that was objectively hostile and offensive enough to rise to the level of severity that entitles her to relief under Title VII."

Pl.'s Opp. Br. at 2, ECF No. 34. She further contends that Mr. Hudson retaliated against her for her protected conduct by "set[ting] her up to fail and look foolish in front of her colleagues." *Id.* at 14. Postmaster General Brennan maintains that both arguments fail as a matter of law. Def.'s Reply Br. at 1, ECF No. 35. The Court agrees.

### 1.  Sex-Based Hostile Work Environment

In order to state an actionable hostile work environment claim, a plaintiff must allege that he or she was subjected to harassment that was severe or pervasive enough "to alter the conditions of the victim's employment and create an abusive working environment, and . . . that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (internal quotation marks and citations omitted). The plaintiff must demonstrate that the workplace atmosphere was "permeated with 'discriminatory intimidation, ridicule, and insult' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . .'" *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

"Courts look at all circumstances to ascertain whether an environment is sufficiently hostile or abusive to support a claim." *Leibovitz v. N.Y. City Transit Auth.*, 252 F.3d 179, 188 (2d Cir. 2001). These circumstances include factors such as the frequency of the discriminatory conduct; the severity of the discriminatory conduct; whether the conduct is physically threatening or humiliating (as opposed to merely offensive); and whether it unreasonably interferes with an employee's work performance. *Harris*, 510 U.S. at 23. These factors are to be evaluated holistically, and no single one is required. *Id.*

Furthermore, the test for sufficiency of a hostile work environment claim has both subjective and objective prongs: the plaintiff must subjectively perceive the environment to be abusive, and the discriminatory conduct must be "severe or pervasive enough to create an objectively hostile or abusive work environment . . . . An environment that a reasonable person would [not] find hostile or abusive . . . is beyond Title VII's purview." *Id.* at 21.

Ms. Rivera argues that Mr. Hudson's conduct during the January 24 meeting, standing alone, is sufficiently severe to impute liability to Defendant for a hostile work environment. Pl.'s Opp. Br. at 10. The Court disagrees.

As a threshold matter, Ms. Rivera has failed to show, by admissible evidence, that Mr. Hudson's pattern of alleged harassing treatment was "because of [Ms. Rivera's] . . . sex." 42 U.S.C. § 2000e-2(a)(1). The conduct complained of by Ms. Rivera—Mr. Hudson's undone pants and belt and public release of flatulence, his yelling and staring, his aggressiveness and demanding disposition—is not necessarily connected to the presence of women in the workplace. After all, "[w]hatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted "*discrimina[tion]* . . . because of . . . sex." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). Ms. Rivera fails to do so.

When Ms. Rivera entered Mr. Hudson's office on January 24, 2015, Mr. Thompson was leaving the office. Although Ms. Rivera testified that she heard Mr. Hudson's belt make noise when he stood up, she has presented no evidence to suggest that she heard or otherwise discerned that Mr. Hudson acted to undo his pants as Mr. Thompson left and Ms. Rivera entered the room. Moreover, Ms. Rivera compared Mr. Hudson's apology to one offered by a person who has left the restroom having inadvertently left the zipper on his pants undone. Ms. Rivera saw neither

Mr. Hudson's undergarments nor what was under his undergarments; instead she saw "some ruffling[] of his shirt," Rivera Dep. at 69:11–13; Def.'s SMF ¶ 11.

Although Mr. Hudson revealed his opened pants again once another female coworker joined the meeting, Ms. Rivera's speculation as to what Ms. Perkins would think about the situation, standing alone, is not sufficiently probative of whether "a reasonable person" would find Mr. Hudson's conduct was "hostile or abusive" on account of her sex. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998); *Goins v. Bridgeport Hosp.*, No. 3:11-cv-560 (SRU), 2013 WL 1193227, at *4 (D. Conn. Mar. 25, 2013), *aff'd,* 555 Fed. App'x 70 (2d Cir. 2014) ("Although [plaintiff] may well have felt ridiculed or intimidated, there is insufficient evidence to support a reasonable conclusion that the occurrences were pervasive and the product of discriminatory intent."). In fact, because there is no testimony from Ms. Perkins, by affidavit or otherwise, Ms. Rivera's testimony on this issue would not be admissible at all. *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); *see, e.g.*, *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (citing Fed. R. Evid. 602 in stating that where a party relies on affidavits or deposition testimony to establish facts, the statements must be made on personal knowledge (internal quotation marks omitted)); *cf. Reilly v. City of W. Haven*, No. 3:02-cv-1346 (SRU), 2005 WL 1293969, at *4 (D. Conn. Mar. 31, 2005) ("[The plaintiff] points only to his own affidavit, his own deposition testimony, and a letter he wrote to a member of the City Council to buttress his claim that the Mayor's actions were retaliatory. The problem is that these documents only contain statements concerning [the plaintiff's] beliefs . . . that [the Mayor] acted to prevent him from obtaining a job . . . .").

In any event, Ms. Rivera's own testimony undercuts the notion that this incident occurred "on account of her sex." Although she testified that it was "[v]ery possible" that she used the word "sexual" in recounting the incident to her boyfriend and that her experience defied easy recognition, she also recognized that Mr. Hudson made no sexual advances or physical contact with her, while alone with her in his office. While she testified that, "because [she] was a woman, [she] felt extremely offended . . . with everything [Mr.] Hudson did with the pants and everything," *id.* at 176:10–15, and later described his behavior as "unprofessional," *id.* at 103:3–6, she also recognized that Mr. Hudson treated female employees no different from male employees, stating that "[h]e was mean to everybody." Rivera Dep. at 176:16–21. Furthermore, Ms. Rivera testified that she understood Mr. Hudson to be a strict manager, who was "big on PDIs," "big on discipline," and "big on grievances." Def.'s SMF ¶ 33. And although Ms. Rivera felt humiliated and targeted as a result of Mr. Hudson requiring her to participate in the April 9, 2015, teleconference, Mr. Hudson required the same participation from a similarly situated male supervisor.

On this motion for summary judgment, Ms. Rivera, the non-moving party, is entitled to the benefit of inferences being made in her favor, but "a transformation of the plaintiff's workplace" that is merely speculative, stated as a conclusion, or contradicted by uncontroverted evidence cannot "meet the threshold" of a single act or pattern of behavior creating a sex-based hostile environment. *See Alfano*, 294 F.3d at 374 ("To decide whether the threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." (citing *Harris,* 510 U.S. at 23)).

While "a plaintiff may rely on incidents of sex-based abuse to show that other ostensibly sex-neutral conduct was, in fact, sex-based, here, no reasonable fact-finder could conclude that

these ostensibly sex-neutral incidents were, in fact, based on sex." *St. Amour v. Lawrence & Mem'l Corp.*, No. 3:09-cv-01055 (JAM), 2016 WL 4744120, at *7 (D. Conn. Sept. 12, 2016) (internal quotations marks and citation omitted) (quoting *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 118 (2d Cir. 2010)). Quite to the contrary, the undisputed evidence reveals an unpleasant and unprofessional working environment for all. *Id.* (citing *Moll v. Telesector Res. Grp.*, 760 F.3d 198, 203 (2d Cir. 2014)); *see also Alfano*, 294 F.3d at 377 ("Even though [certain allegations] can support an inference that [plaintiff] was mistreated, they do not support an inference that this was because of her sex."). To withstand summary judgment, Ms. Rivera must be able to show through admissible evidence that "incidents apparently sex-neutral were in fact motivated by bias." She cannot.

"[A]n environment which is equally harsh for both men and women . . . does not constitute a hostile working environment under the civil rights statutes. *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) (citing *Oncale*, 523 U.S. at 118). Accordingly, Ms. Rivera has failed to raise a genuine issue of material fact as to whether her workplace atmosphere was "permeated with 'discriminatory intimidation, ridicule, and insult' . . . that [was] 'sufficiently severe or pervasive to alter the conditions of the [her] employment and create an abusive working environment . . . .'" *Harris*, 510 U.S. at 21.

Even if Ms. Rivera had created a genuine issue of material fact that Mr. Hudson's conduct related to her gender—which, as noted above, she has not—generally, "isolated remarks or occasional episodes of harassment will not merit relief under Title VII." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304, n.5 (2d Cir. 1995) (citations omitted). As the Second Circuit has held, the alleged incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Carrero v. New York City Housing Auth.*, 890 F.2d

569, 577–78 (2d Cir. 1989); *see Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998) (affirming district court's grant of summary judgment when plaintiff alleged that her supervisor told her that she had been "voted the 'sleekest ass' in the office" and on another occasion "deliberately touched [her] breasts with some papers that he was holding in his hand").

Of course, since the relevant legal standard is "severe" or "pervasive, *Quinn*, 159 F.3d at 765, an employer's single act may be "sufficiently severe," and may "alter the plaintiff's conditions of employment without repetition," rising to the level of actionable harm. *Id.* at 768; *Tomka*, 66 F.3d at 1305 ("Even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability."); *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (finding a "single incident of verbal harassment" was sufficient, considering all the circumstances, because supervisor's verbal harassment was obscene, loud, and occurred in "a large group in which Howley was the only female and many of the men were her subordinates"); *see also Redd v. New York City Division of Parole*, 678 F.3d 166, 180 (2d Cir. 2012) (permitting plaintiff's claim of a hostile work environment to survive summary judgment when a co-worker had touched her breasts "without any apparent legitimate need" after "contriv[ing] to be in close proximity" to her); *Flowers v. N. Middlesex YMCA*, No. 3:15-cv-705 (MPS), 2016 WL 1048751, at *4 (D. Conn. Mar. 11, 2016) ("Physical abuse, such as unconsented touching and striking— particularly on sensitive areas of the body such as buttocks or breasts—are more severe than other forms, such as vulgar banter . . . . In this sense, Thortenson's alleged 'striking' of Flowers' buttocks was particularly severe") (internal citations omitted).

On this record, applying the relevant precedent, no reasonable juror could find that Mr. Hudson's conduct was "severe or pervasive enough to create an objectively hostile or abusive

work environment." Ms. Rivera testified that she was so "shocked, disgusted," and "embarrassed" as a result of Mr. Hudson's conduct that she excused herself from the January 24th meeting, but Ms. Rivera provides no evidence that the events of January 24th meeting adversely or materially impacted her ability to do her job, by, for example, fomenting "gender-based skepticism" that could produce a life threatening situation. *See Howley*, 217 F.3d at 154 (noting that, in a case involving the claims of a female firefighter, that "the fomenting of gender-based skepticism as to the competence of a commanding officer may easily have the effect, among others, of diminishing the respect accorded the officer by subordinates and thereby impairing her ability to lead in the life-threatening circumstances often faced by firefighters."); *see also Adams v. City of New York*, 837 F. Supp. 2d 108, 127 (E.D.N.Y. 2011) (finding that the conduct of a male supervisor who answered the door shirtless and with his pants unzipped for a female correction officer and a group of inmates was "not sufficiently severe to overcome its lack of pervasiveness." (quoting *Mormol v. Costco Wholesale Corp.,* 364 F.3d 54, 59 (2d Cir.2004))); *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 106 (W.D.N.Y. 2011) (finding that a urinating man did not intentionally expose himself directly to a female cleaner, but, rather, was indifferent to her presence by the sinks while he was at the urinal, although "inappropriate behavior on the part of the man," was insufficient to constitute a hostile work environment).

In fact, Ms. Rivera acknowledges that she never spoke with Ms. Perkins about the incident. Ms. Rivera also fails to provide any record evidence that Ms. Perkins was a subordinate or that Ms. Perkins thought any differently about or acted any differently toward Ms. Rivera as a result of the conduct she now challenges. Likewise, although Ms. Rivera claims that she had too much work to complete the daily APR that Mr. Hudson demand she complete, the evidence in the record is to the contrary; she could and did provide the report.

Finally, Ms. Rivera also claims that, over time, she felt increasingly more humiliated and anxious, and, as a result, lost sleep. While assessing a victim's mental state in the context of an allegedly sex-based hostile work environment "by its nature cannot be[] a mathematically precise test," Ms. Rivera's increasingly anxious state, cannot, by itself, create a disputed issue of material fact. *See Harris*, 510 U.S. at 22. Title VII "requires an objectively hostile or abusive environment—one that a reasonable person would find hostile or abusive, not just the alleged victim's subjective perception of the environment. *Id.* at 17. Ms. Rivera, however, has proffered no evidence that the challenged conduct during the January 24th meeting objectively "alter[ed] the plaintiff's conditions of employment" rising to the level of actionable harm. *Quinn*, 159 F.3d at 768 (2d Cir. 1998) *abrogated on other grounds by Cox v. Onondaga Cty. Sheriff's Dep'*, 760 F.3d 139 (2d Cir. 2014).

Rivera has failed to create a genuine issue of fact as to whether Mr. Hudson's conduct was sufficiently severe or pervasive to result in a material change in the workplace environment. Defendant's motion for summary judgment on her sexual harassment claim under Title VII therefore is granted**.**

## 2.    Retaliation

Ms. Rivera alleges that, while at the Bridgeport Post Office, several factors combined to create a materially adverse change in her conditions of employment as retaliation for her complaining about harassment.[3] The Court disagrees.

Title VII "prohibits employers from retaliating against any employee because that individual has opposed any practice made unlawful by Title VII." *Ya-Chen Chen v. City Univ. of*

---

[3] Ms. Rivera's opposition brief solely discusses the April 9, 2015, teleconference as evidence of a retaliatory hostile work environment, but at oral argument, Ms. Rivera presented the argument more broadly.

*N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015) (citing 42 U.S.C. § 2000e–3(a)) (internal quotations omitted).

To establish a *prima facie* case of retaliation under Title VII, the plaintiff bears the initial burden to submit "evidence that she 'participated in a protected activity,' 'suffered an adverse employment action,' and 'that there was a causal connection between [his] engaging in the protected activity and the adverse employment action.'" *Id.* (quoting *Gorzynski v. Jet Blue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010)). The parties do not dispute that Ms. Rivera engaged in protected activity; rather, Postmaster General Brennan argues that Ms. Rivera has failed to establish a genuine issue of material fact as to the second element, an adverse employment action.

An adverse employment action is any action that causes the Plaintiff to "endure[ ] a materially adverse change in the terms and conditions of employment . . . [and a] materially adverse change is one that has an attendant negative result, a deprivation of a position or an opportunity." *Gutierrez v. City of N.Y.*, 756 F. Supp. 2d at 506 (citations and internal quotation marks omitted). Termination of employment or discharge from employment therefore are adverse employment actions. *Id.*

Termination, however, is not the only adverse employment action recognized in Title VII claims. Courts in this Circuit have also recognized the creation of a hostile work environment as an adverse employment action. *See Villar v. City of N.Y.*, 135 F. Supp. 3d 105, 137 (S.D.N.Y. 2015) (evaluating argument that plaintiff was subjected to "retaliatory hostile work environment" at summary judgment stage); *Sclafani v. PC Richard & Son*, 668 F. Supp. 2d 423, 439 (E.D.N.Y. 2009) (recognizing that "unchecked retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment action so as to satisfy [that prong] of the retaliation *prima facie*

case") (internal marks and quotations omitted). "To establish that a retaliatory hostile work environment constitutes a materially adverse change that might dissuade a reasonable worker from reporting activity prohibited by Title VII, a plaintiff must satisfy the same standard that governs hostile workplace claims . . . ." *Id.* at 438 (citation and internal quotation marks omitted); *see also Burlington N. & Santa Fe Ry. Co. v. White* (*Burlington Northern*), 548 U.S. 53, 64 (2006) ("Thus, purpose reinforces what language already indicates, namely, that the antiretaliation provision, unlike the substantive provision [of Title VII], is not limited to discriminatory actions that affect the terms and conditions of employment." (citation omitted)).

Finally, Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern*, 548 U.S. at 67.

The parties do not dispute that Ms. Rivera engaged in protected conduct. They do dispute whether there was a materially adverse employment action and a nexus between the protected activity and the harm that arose from the retaliation for engaging in that protected conduct.

### a.     The Teleconference

Ms. Rivera claims that she suffered an adverse change in her employment when Mr. Hudson "set her up to fail and look foolish" on the April 9, 2015, teleconference. Pl.'s Opp. Br. at 14. As discussed above, Mr. Hudson allegedly denied important information in advance of the call to Ms. Rivera and a similarly situated male supervisor. Rivera Dep. at 200:16–18. It is also undisputed that Mr. Hudson asked all three supervisors, including Ms. Rivera, to be prepared to participate in the teleconference. Pl.'s SMF ¶ 42; Def.'s SMF ¶ 42. As a result, there is no evidence in the record that supports the proposition that Ms. Rivera was treated any differently from her colleagues. Moreover, Ms. Rivera has presented no evidence that she, in fact, failed or

how such a failure was objectively materially adverse.[4] *Burlington Northern*, 548 U.S. at 68 ("[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse . . . ."). By definition, Ms. Rivera's feeling of being humiliated, if it does not affect her job status or security, does not amount to an materially adverse change in her employment. Without more, her experience alone cannot support her claim.

### b.      Voluntary Transfer

Ultimately, Ms. Rivera, of her own volition, requested a transfer away from the Bridgeport Post Office because the work environment allegedly led to her feeling anxious and upset and losing sleep, and culminated in a panic attack the week after transferring to the Stratford post office. She argues that a reasonable employee, standing in her shoes, would respond to Mr. Hudson as Ms. Rivera did. The Court disagrees.

In *Burlington Northern*, the Supreme Court noted that:

> A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.

*Id.* at 69 (internal citations omitted).

Although noting that reassignment is not *per se* actionable, the Supreme Court found that reassignment of duties can constitute retaliatory discrimination where both the former and present duties fall within the same job description. *Id.* at 70–71. Because the jury had before it

---

[4] Although, Ms. Rivera testified that she and her male co-worker were made to "look[] like buffoons," Ms. Rivera cannot escape the fact that, given she was treated no different than her male co-worker, who presumably has not complained about discrimination, there is little, if any risk, that a reasonable employee, standing in Ms. Rivera's position, would opt not to complain about discrimination. Rivera Dep. at 200:19–25.

"considerable evidence" that one job's duties were "by all accounts more arduous and dirtier";

that the other job "required more qualifications, which [was] an indication of prestige"; and that

the latter job was "objectively considered a better job and the male employees resented [the

plaintiff, a female] for occupying it," the Supreme Court determined that "a jury could

reasonably conclude that the reassignment of responsibilities would have been materially adverse

to a reasonable employee." *Id.* at 71.

In *Terry v. Ashcroft*, 336 F.3d 128 (2d Cir. 2003), the plaintiff alleged his transfer to

another division was in retaliation for his complaints he made to the agency's Equal Employment

Opportunity ("EEO"). *Id.* at 143. To support his claim, the plaintiff pointed to a recorded

telephone conversation he had with his supervisor before the transfer. *Id.* In that conversation,

the plaintiff asked his former supervisor why he was transferred, to which the supervisor

responded: "My belief is that they were trying to screw you." *Id.* The defendant argued that the

transfer was "a form of discipline," which the court noted "does not show a lack of retaliation, as

discipline can be retaliatory if done to punish an individual from complying. *Id.* at 144. In any

event, the court found sufficient evidence for a trier of fact to conclude that the transfer was

materially adverse in large part because the record suggested that the plaintiff's supervisors who

ordered the transfer perceived the transfer as adverse. *Id.*

And, in *Abrams v. Department of Public Safety*, 764 F.3d 244 (2d Cir. 2014), the court

affirmed summary judgment against the plaintiff for want of causation. *Id.* at 255. There, the

plaintiff was transferred to a different unit after he filed a complaint with the Connecticut

Commission on Human Rights and Opportunities. *Id.* at 254. Upon being transferred, the

plaintiff was relegated to ministerial tasks, whereas in his former position he performed

investigations. *Id.* Moreover, "[n]ot only was [the plaintiff's] travel-time doubled from his prior

work assignment, but he was no longer eligible for overtime." *Id.* The Second Circuit agreed with the district court that the plaintiff made out a *prima facie* case of retaliation for his reassignment, but he failed to provide sufficient evidence of temporal proximity to prove pretext. *Id.*

By contrast, Ms. Rivera has presented no admissible evidence that would objectively support an inference that her work environment, such as it was, would "dissuaded a reasonable worker from making or supporting a charge of discrimination," *Burlington Northern*, 548 U.S. at 68 (citation omitted), as opposed to her ailments being related to the fact that she is a "nervous person," Rivera Dep. at 214:2–4; *see also id.* at 68–69 ("An objective standard is judicially administrable. It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings."). Indeed, assuming this medical evidence would show a materially adverse change related to her work environment, such evidence would have to be provided by an expert witness. *See* Fed. R. Ev. 702 ("A witness who is qualified . . . may testify in the form of an opinion or otherwise if . . . the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue . . . ."); *see, e.g.*, *Barnes v. Anderson*, 202 F.3d 150, 159 (2d Cir. 1999) ("[E]xpert medical opinion evidence is usually required to show the cause of an injury or disease." (citation omitted)).

In any case, her decision to seek a transfer, alone, does not work a materially adverse change that could support a claim of retaliation. *See Davis v. NYS Dep't of Corr. Attica Corr. Facility*, 110 F. Supp. 3d 458, 464 (W.D.N.Y. 2015) (finding that a "completely voluntary[,] purely lateral transfer, with no diminution in pay, benefits, or job responsibilities" was not materially adverse when viewed by a "reasonable employee"); *see also Kaytor v. Elec. Boat*

*Corp.*, 609 F.3d 537, 555 (2d Cir. 2010) ("[A] lateral job transfer that does not affect an employee's salary or title may be the basis for a Title VII retaliation claim only if the reassignment would have been viewed by a reasonable employee as being materially adverse.").

In *Burlington Northern*, *Terry*, and *Abrams*, objective factual evidence of a materially less desirable job, notwithstanding the retention of the same job title, provides the common denominator. *Compare Burlington Northern*, 548 U.S. at 71 (noting that the new position was "more arduous and dirtier," "required more qualifications" and was less prestigious), *with Terry*, 336 F.3d at 144 (noting that plaintiff's supervisors perceived the transfer as adverse), *with Abrams*, 764 F.3d at 254 (noting that the new position was largely ministerial, did not qualify for overtime, and was a further commute). Here, Ms. Rivera has offered nothing more than speculative testimony that, no matter its ultimate form, would be inadmissible in court. *See Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment," and a "district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence." (quoting *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 582 F.3d 244, 264 (2d Cir. 2009)).

Alternatively, Ms. Rivera argues that Mr. Hudson made her work environment so intolerable, that she was constructively discharged. While the Second Circuit has not recognized constructive voluntary discharge in the context of Title VII retaliation, another court in the District, on at least one occasion, has. In *Lyddy v. Bridgeport Board of Education*, No. 3:06-cv-1420 (CFD), 2010 WL 4736270 (D. Conn. Nov. 15, 2010), the Court denied summary judgment on the plaintiff's retaliation claim where she, herself, sought a transfer. *Id.* at *8. The Court did so only after noting an objective material adverse change in her employment: she sought a

transfer to a position with limited career opportunities at another school in the district after having worked for a particular school for eighteen years. *Id.* at 8.

The Court need not confront the issues of constructive voluntary transfer here because, even if the Court assumes Ms. Rivera was constructively transferred, she has not provided evidence of a material adverse change sufficient to sustain her Title VII retaliation claim. Indeed, this record lacks any objective indicia of a materially adverse change in Ms. Rivera's position.

Ms. Rivera also asserts that, after taking leave from work at the Stratford post office due to stress and anxiety, she was disadvantaged in applying for lateral or upward movement within the organization. *Id.* ¶ 34. After allegedly applying for over fifteen lateral transfers within the postal service, none of which were granted, Ms. Rivera believes that sick leave taken in 2015 prompted these denials. But, as discussed above with Ms. Rivera's other assertions, Ms. Rivera's speculative testimony about why she was allegedly denied lateral transfers would not be admissible at trial. *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); *cf. Reilly v. City of W. Haven*, No. 3:02-cv-1346 (SRU), 2005 WL 1293969, at *4 (D. Conn. Mar. 31, 2005) ("[The plaintiff] points only to his own affidavit, his own deposition testimony, and a letter he wrote to a member of the City Council to buttress his claim that the Mayor's actions were retaliatory. The problem is that these documents only contain statements concerning [the plaintiff's] beliefs . . . that [the Mayor] acted to prevent him from obtaining a job . . . .").

Even more importantly, the record lacks any probative (and admissible) evidence to support her denial of transfer claim. Apart from Ms. Rivera maintaining that a doctor instructing

her that it would not be healthy for her to return to work,[5] Ms. Rivera has not offered evidence about which positions she sought to be transferred, where these positions were, the qualifications required for the transfer positions or the qualifications of those who filled them, if these positions were indeed filled. She also has not presented evidence that others, who had not been on sick leave, were permitted to transfer, while she was not. The record does not even indicate whether any open positions were not filled through promotions rather than transfers. Nor has she presented evidence to support her claim that the amount of leave taken is the "number one factor taken into account" when the postal service evaluates applications for lateral transfer. Pl.'s SMF ¶ 24. In fact, other than her inadmissible testimony, unsupported and based only on speculation, the record suggests otherwise. Even after returning from medical leave, Ms. Rivera, at her request, was transferred from Stratford to North Haven, and again to Wallingford. Def.'s SMF ¶¶ 1–2.

Lastly, relying on *Abrams*, Ms. Rivera claims an adverse employment action because of her current inconvenience in traveling to work. In particular, she claims to have incurred additional traveling expenses because she no longer works in Bridgeport, where she lives. But her use of *Abrams* misses the mark. In *Abrams*, the court cites travel time as one factor of many, supporting a *prima facie* case of retaliation. *See* 764 F.3d at 255. As discussed above, here, there are no other factors that raise a material factual dispute, either alone or together. Moreover, Ms. Rivera has not offered evidence to suggest that the several positions she voluntarily transferred to are materially adverse, *e.g.*, the new positions were less prestigious, *see Burlington Northern*,

---

[5] Given that Ms. Rivera does not offer testimonial evidence about what her doctor said for the truth of the matter, the Court recognizes that Ms. Rivera's testimony in this respect would not be subject to the evidentiary prohibition of hearsay. *See* Fed. R. Evid. 801(c) ("'Hearsay' means a statement . . . a party offers in evidence to prove the truth of the matter asserted in the statement."). Nonetheless, through the affidavit of Gary Thompson, Ms. Brennan reports that there have been no requests by postal or non-postal persons regarding Ms. Rivera's sick-leave balance while at the Bridgeport office, Thompson Aff. ¶ 3, Def.'s Reply Br., ECF No. 35-3, which suggests that Ms. Rivera's testimonial evidence would have to stand on its own, without documentary evidence.

548 U.S. at 71, that the employer knew the transfer was adverse, *see Terry*, 336 F.3d at 144, that, while maintaining the same title, the added travel impacted the quality of her duties, *see Abrams*, 764 F.3d at 254, or that the travel time and expense impacted her ability to care for school-age children. *See Burlington Northern*, 548 U.S. at 69.

In sum, Ms. Rivera has not provided admissible evidence of "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)

In the end, while her workplace environment may well have been unpleasant or uncivilized, it fell short of the conduct Title VII seeks to deter. "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington Northern*, 548 U.S. at 68 (citation omitted).[6]

Ms. Rivera has failed to establish a genuine dispute of material fact as to her claim of retaliatory hostile work environment.

No reasonable juror therefore could find that could find for Ms. Rivera on either her discrimination or retaliation claims under Title VII.

## IV. CONCLUSION

For the reasons discussed above, the motion for summary judgment is **GRANTED**.

The Clerk of the Court is instructed to enter judgment for Defendant and close this case.

---

[6] Having found insufficient evidence to support Ms. Rivera's argument that she suffered an adverse employment decision, the Court need not and does not address the issue of causation.

**SO ORDERED** at Bridgeport, Connecticut, this 31st day of January, 2018.

      /s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE